IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

OPERATING ENGINEERS CONSTRUCTION
INDUSTRY MISCELLANEOUS PENSION
FUND, individually and on behalf of all others
similarly situated, et al.,

                Plaintiffs,

v.                                                      Case No.  25-2153-JWB

MGP INGREDIENTS, INC., et al.,

                Defendants.

**MEMORANDUM AND ORDER**

This matter is before the court on Defendants' motion to dismiss.  (Doc. 74.)  The motion is fully briefed and ripe for decision.  (Docs. 75, 76, 82, 83.)  The motion is GRANTED for the reasons stated herein.  Also before the court is Defendants' motion for judicial notice of exhibits submitted with their motion to dismiss.  (Docs. 75, 77, 78.)  That motion (Doc. 77) is GRANTED.

## I.   Facts

This is a class action brought by various holders of securities against a liquor company for alleged violations of federal securities laws.[1]  The following facts are taken from the consolidated class action complaint.  (Doc. 61.)  The court assumes their truth for the purposes of this order. Plaintiffs are various pension funds and retirement systems who purchased the common stock of Defendant MGP Ingredients during the relevant period and were allegedly injured as a result of

---

[1] The court notes that Plaintiffs' complaint is 99 pages long and some facts are repeated at length; it is anything but a "short and plain statement of the claim."  Fed. R. Civ. P. 8 (a)(2).  Had the parties not already expended significant time litigating this case and briefing a motion to dismiss, the court would have considered striking the complaint for failure to comply with Rule 8.  The court encourages the parties to minimize the length of their filings with this court.

Defendants' violations of federal securities laws. (*Id.* at 12-13.)[2]  Defendant MGP Ingredients (hereinafter "MGPI") is a publicly traded company that produces "distilled spirits and specialty wheat ingredients." (*Id.* at 14.) MGPI has three divisions: Distilling Solutions, Branded Spirits, and Ingredient Solutions.  (*Id.*)  Distilling Solutions supplies bourbons, whiskeys, gins, and industrial and fuel grade alcohol.  (*Id.* at 14.)  Through this part of its business, MGPI "provides blending and warehouse services in which MGPI blends and stores barrels of spirits for third-party producers for a monthly fee." (*Id.*)  Branded Spirits supplies various kinds of premium and value branded distilled spirits and private label spirits.  (*Id.*)  MGPI's Distilling Solutions and Branded Spirits divisions make up the vast majority of its business, and Distilling Solutions is the primary subject of this lawsuit.  *See* (*id.* at 14, 80.)

Defendant David Colo was the President and CEO of MGPI from May 2020 to December 31, 2023.  (*Id.* at 14.)  Defendant David Bratcher was MGPI's President and CEO and a member of the Board of Directors from January 1, 2024, to December 31, 2024.  Prior to this Bratcher was the COO and President of Branded Spirits.  (*Id.*)  Defendant Brandon Gall has been MGPI's CFO and Vice President of Finance since April 2019.  (*Id.*)  Gall is also presently the interim President and CEO. (*Id.* at 15.)  Plaintiffs claim these individual Defendants knew of material non-public information about the business and either knew or recklessly disregarded "adverse facts" that had not been disclosed and were "actively concealed from, the investing public."  (*Id.*)

According to Plaintiffs, Distilling Solutions is MGPI's most important business segment, having accounted for over half of the company's revenues in 2022 and 2023.  (*Id.* at 17.)  Core to Distilling Solutions work is "brown goods" or the "production and sale of bourbon, rye, and other whiskeys or unaged new distillate to third party customers."  (*Id.*)  Distilling Solutions regularly

---

[2] In citations to the record, the court refers exclusively to the ECF assigned pagination at the top of all documents filed with the court.

enters bill and hold agreements where MGPI will sell distillate to customers in advance, barrel the distillate, and store it for a fee, at an MGPI warehouse, until such time as the customer "picks" the barrel. (*Id.* at 14, 16-17.) At that point the barrel is shipped to customers. (*Id.* at 17.) Plaintiffs allege that when MGPI's barrel "fills" exceed its "picks" MGPI has more barrels of spirits in storage than deliveries, which indicates decreasing demand and more inventory. (*Id.*) Plaintiffs tell the court that "excess inventories are a death knell for a liquor distilling business." (*Id.*)

The precise facts of this dispute began during the COVID-19 pandemic, when alcohol consumption increased. (*Id.* at 17-18.) "[T]he liquor industry experienced extraordinary growth from pandemic-fueled demand for alcoholic beverages." (*Id.* at 18.) During this time MGPI increased production, and revenue grew 58.5% from 2020 to 2021, and increased 24.8% from 2021 to 2022. (*Id.*) Demand for alcohol declined however when pandemic-era restrictions were lifted. (*Id.*) Plaintiffs contend this resulted in a return of "pre-pandemic patterns of consumer behavior and a downturn in demand for alcohol" by the middle of 2022. (*Id.*) In 2023, there was a decline in sales of spirits in the United States during a calendar year for the first time in 30 years. (*Id.*)

Plaintiffs allege that this slowdown was noticeable by late 2022 and that MGPI was internally discussing inventory and stockpiles frequently by this point. (*Id.*) Analysts brought these concerns to MGPI's attention on earnings calls in early 2023. (*Id.* at 18-19.) MGPI responded saying there weren't any present indications of a slowdown within Distilling Solutions. (*Id.* at 19.) MGPI also assured that for brown goods, demand remained strong and MGPI was not seeing excess capacity in the market. (*Id.*) Defendant Colo stated, "we feel well positioned, and we think there's going to be adequate demand going forward to support continued growth." (*Id.*) The individual Defendants throughout the class period allegedly assured investors that MGPI was "uniquely positioned" to avoid industry issues, demand remained strong, and company leadership

3

had "visibility" into current and future demand and inventory levels. (*Id.*) Analysts on a May 4, 2023, earnings call asked for additional information on MGPI's inventory. (*Id.* at 20.) Defendant Colo responded by saying "distributors may be hearing a little more inventory at this point than normal" but that this was already part of MGPI's full year guidance. (*Id.*) In response to another question, Defendant Colo told investors that he expected inventory to "normalize" by the end of the year and "shipments should [be] equal to [completions]." (*Id*) (modifications in original).

In response, analysts noted the difference between the negative sentiment surrounding competitors and the positive statements coming from MGPI. (*Id.* at 21.) MGPI's stock rose as a result. (*Id.*) Similar comments to analysts continued throughout 2023, with analysts again noting the positive aspects of MGPI's market position. (*Id.* at 21-22.) Defendants repeatedly emphasized that the company's future brown goods production was "committed" to its customers for 2023 and 2024. (*Id.* at 22.) MGPI also represented to analysts that it was opening new warehouses in Kentucky to store "additional barrels of whiskey that the Company's customers purportedly demanded[.]" (*Id.* at 23.) Analysts continued to express concern about industry wide inventory pressure. (*Id.* at 23-24.) Defendants remained committed to the line that their inventory was not "imbalanced." (*Id.* at 24.) Analysts again reacted positively. (*Id.*)

Plaintiffs then submit statements by alleged former employees that show Defendants knew their statements to analysts were false. (*Id.*) One former MGPI employee ("FE-1") was a Warehouse Logistics and Quality Manager who worked at Defendant from January 2023 to July 2024. (*Id.* at 25-26.) This former employee reported to Defendants Bratcher and Gall. (*Id.* at 26.) FE-1 claims he was on weekly calls with MGPI's leadership team to include Defendants Bratcher and Gall. (*Id.*) FE-1 claims that he had access to MGPI performance data prior to his time at the company. (*Id.*) He confirms Plaintiffs' suspicions by reporting that "picks" slowed significantly

4

in 2023. (*Id.* at 27.) Despite this, the company apparently continued to "fill" at the same rate, leading to major shortages of warehouse space. (*Id.*) FE-1 also remembers customers increasingly "getting out of their contractual purchasing commitments" with MGPI. (*Id.* at 28.) Despite bringing this to leadership's attention, MGPI allegedly continued to fill barrels and told FE-1 he needed to find a place to put them. (*Id.*) FE-1 claimed MGPI was: "putting barrels where we should not have been putting them. We were over capacity in our warehouses even from a safety standpoint." (*Id.* at 29.)

Plaintiffs attach pictures of these conditions to their complaint. (*Id.* at 30-31.) The court has reproduced screenshots below:





(*Id.*)  FE-1 then claims that management's solution to this problem was to expand the warehouses rather than to "dial back production. (*Id.* at 31.)  This expansion project fell through in November 2023.  (*Id.*)  It was after this that FE-1 states the company went into "full crisis mode" and had to "shove barrels wherever."  (*Id.* at 32.)  He apparently asked if the company was going to scale back production; leadership said no.  (*Id.*)  MGPI then began sending excess barrels to third-party storage facilities.  (*Id.*)  According to FE-1, when he started at the company in January 2023, it had an inventory between 1 and 2 million barrels.  (*Id.*)  When he left in July 2024, inventory was 3.6 million.  (*Id.*)  FE-1 confirmed that when company officials assured investors in May 2024 that inventory had stabilized, Defendants knew about the problem but told investors something else.  (*Id.* at 33.)  This was allegedly part of why FE-1 left the company.  (*Id.*)  FE-1 speculated that Defendants created the scheme to reap bonuses.  (*Id.*)

Another former employee ("FE-2") alleges similar circumstances.  (*Id.* at 34.)  FE-2 served as MGPI's Executive Vice President of Operations from June 2024 to October 2024.  (*Id.*)  FE-2 reported directly to Defendant Bratcher.  (*Id.*)  FE-2 "very quickly realized that MGPI's customer demand had been significantly waning."  (*Id.*)  He corroborated FE-1's report that customers were not picking the volume they were contractually obligated to in 2024.  (*Id.* at 35.)  FE-2 said Defendant Bratcher directed the continued high volume of production.  (*Id.* at 36.)  FE-2 said

6

MGPI's contracts were "garbage" because they could not "force [customers] to take the volume" they had committed to. (*Id.*) The company allegedly had to "offer discounts and incentives to customers" so that those customers would fulfill their commitments. (*Id.*) FE-2 also confirmed that MGPI leadership knew about demand and inventory issues prior to disclosing it on earnings calls. (*Id.* at 37.)

A third former employee ("FE-3") corroborates this information. (*Id.*) FE-3 is a former Director of Sales Operations for Distilling Solutions. (*Id.*) He worked there from January 2023 to October 2023, though he had held other roles at the company since 2015. (*Id.* at n. 4.) He was frequently in meetings with Defendants Colo and Gall. (*Id.*) FE-3 estimated the price for contract distilling had dropped 40 percent from 2021 to 2023. (*Id.* at 38.) FE-3 further supported the earlier allegations that MGPI's contracts with customers were weak and goes so far as to allege the company had a "policy" allowing volume customers out of contracts. (*Id.*) Internal forecasts on demand and sales did not match with what Defendants were allegedly telling markets. (*Id.*)

A final former employee ("FE-4") worked for the company from June 2022 to January 2024 as a Customer Service Specialist. (*Id.* at 39.) FE-4 claims that the company was losing customers in the distilled whiskey business. (*Id.*) The market was "saturated." (*Id.*) FE-4 listened to earnings calls and said that Defendants' statements that the whiskey market possessed resilient growth were false and inaccurate. (*Id.*) FE-4's internal experience at MGPI did not match up with Defendants' projections to markets. (*Id.*)

Plaintiffs have also come into the possession of some MGPI internal company documents. (*Id.*) These, they say, support their claims. The first three documents Plaintiffs claim to have are a "Warehouse Capacity Model", a "Historical Fill and Pick Rate Data Report", and a "Business Review Meeting" ("BRM") report. (*Id.* at 40.) These documents allegedly show that Defendants

knew MGPI was suffering from demand and inventory issues. (*Id.*) These documents were updated regularly. (*Id.*) Again, Plaintiffs claim these documents show "'fills'—i.e., how many barrels the Company actually filled—and 'picks'—i.e., when a barrel was being physically picked and transported to a customer." (*Id.*) Apparently, the number of barrels MGPI was filling was "vastly exceeding" picks. (*Id.*) Between January and November 2023, MGPI allegedly had double the number of fills versus picks. (*Id.* at 40-41.)

The second group of reports are "Warehouse Capacity and Consolidation" reports from November and December 2023. (*Id.* at 41.) These reports were prepared for MGPI leadership as the company experienced inventory issues. (*Id.* at 41-42.) The reports show that the average number of picks per month declined 16% in 2023, as compared to large increases in the preceding two years. (*Id.* at 42.) The reports also show an increase in production, despite this decrease in demand. (*Id.* at 43.) Despite picks tapering off, fills continued to rise. (*Id.*) The percentage of fills exceeding picks had grown to 113% in 2023 despite that ratio only being 49% in 2020. (*Id.* at 44.) These levels were all-time highs, according to the report. (*Id.*) The reports noted that one of the objectives "for the warehousing team was the 'alignment between fill rates and anticipated storage capacity limits.'" (*Id.*) The November 2023 report projected that the company would be out of warehouse space by mid-summer 2024, were then current trends to continue. (*Id.* at 45.) MGPI looked for ways to solve the storage problem. (*Id.*) Plaintiffs claim these methods would have been inefficient, "unorthodox—and potentially unlawful[.]" (*Id.* at 45-46.) The report noted risks to employee safety because of the excess capacity. (*Id.* at 46.) Defendants did not convey this inventory problem to investors despite being directly asked on earnings calls. (*Id.* at 47.)

In the beginning of 2024, investors began to see MGPI's problems. (*Id.* at 48.) MGPI "surprised investors by announcing disappointing guidance for fiscal year 2024 ("FY 2024")."

8

(*Id.*) MGPI's sales guidance came in millions below market estimates. (*Id.*) MGPI's stock fell 15% in one day as a consequence. (*Id.*) Defendants continued to deny inventory issues, however. (*Id.*) Plaintiffs also allege that MGPI shifted its sales strategy from "aged distillate" to "new distillate." (*Id.*) In response to analyst questions about the move, MGPI denied it had anything to do with inventory or demand. (*Id.* at 48-49.) Defendant Bratcher assured investors that "Defendants personally 'monitor[ed] the potential impact of inventory levels at distributors, overall American whiskey supply and consumption patterns, and inflation on consumers.'" (*Id.* at 49.) Defendants continued to tell investors that the Company had a "competitive advantage." (*Id.*) Analysts reacted positively, with at least one continuing to rate the stock a "Buy." (*Id.* at 50.)

In May 2024, Defendants reiterated their belief that MGPI was in a good position relative to the industry and that demand had not changed. (*Id.*) Analysts continued to take note of MGPI's positive statements. (*Id.* at 50-51.) In August 2024, Defendants' public position had not changed. (*Id.* at 51.) Defendant Bratcher insisted "inventory is exactly where we need it." (*Id.*)

In October 2024, Plaintiffs allege that Defendants "were finally forced to come clean." (*Id.*) On October 17, 2024, Defendants "preannounced" earnings results for the third quarter of 2024. (*Id.* at 52.) Apparently, sales were in a 24% year-over-year decline. (*Id.*) Fiscal year guidance for 2024 was also reduced. (*Id.*) Defendants acknowledged that elevated inventory was putting pressure on the business. (*Id.*) In the next three days, MGPI's stock declined 30%. (*Id.*) Analyst reactions were negative, calling into question management's credibility given their previous assurances. (*Id.*) On October 31, 2024, Defendants formally released financial results that "materially missed" prior expectations. (*Id.* at 53.) Defendant Bratcher acknowledged that the company now planned to scale back whiskey production and was suffering from inventory and demand issues. (*Id.* at 53-54.) Defendants also admitted that customers were unable to meet their

9

contractual commitments to purchase whiskey. (*Id.* at 54.) MGPI stock declined another 15% in one day. (*Id.*) Markets were surprised that MGPI was only then "realizing" a slowdown in consumption despite the broader industry having seen this for the past "12, almost 18 months." (*Id.*) Defendant Bratcher was removed as CEO at the end of 2024 with no permanent successor identified. (*Id.* at 55.) Defendant Gall would succeed him in the interim. (*Id.*) In the fourth quarter of 2024, more bad results rolled in for MGPI, with sales declining 25%. (*Id.*) The first quarter of 2025 was not better as the company's Distilling Solutions segment experienced a 45% decline in sales. (*Id.*)

Plaintiffs allege this conduct violates Sections 10(b) and 20(a) of the Securities Exchange Act and the Securities and Exchange Commission's ("SEC") Rule 10b-5. The complaint alleges Defendants made "materially false and misleading statements and omitted material facts" which "concern[ed] MGPI's financial and operation condition" and MGPI's "demand, inventory levels, customer sales commitments and demand visibility[.]" (*Id.* at 55-56.)

For Plaintiffs, there are several buckets of statements that expose Defendants to liability, statements made in: (1) May 2023; (2) August 2023; (3) November 2023; (4) February 2024; (5) May 2024; and (6) August 2024. On May 4, 2023, MGPI released financial results with an accompanying press release. (*Id.* at 56.) This press release was filed with the SEC and signed by Defendants Gall and Colo. (*Id.*) In that release MGPI claimed "strong new distillate customer commitments, higher pricing across all brown goods, and stronger than expected customer demand for spot purchases." (*Id.*) On the earnings call the same day, Defendant Colo said MGPI maintained "ongoing solid demand for our new distillate and aged whiskey" and that "demand for MGPI's products in each of our 3 segments remains strong . . . our business continues to be well positioned." (*Id.*) (omission in original). Defendant Colo noted MGPI's "significant share, scale

advantage and our aging whiskey inventory position." (*Id.*)  The company had, according to Colo, "improvement in demand and visibility and consistency" because "brown good sales growth continues to outpace longer-term market trends." (*Id.*)  Plaintiffs claim these and other statements specified in the complaint were materially false and misleading and that Defendants knew so.  (*Id.* at 57-59.)  They claim that the company's internal documents and former employees confirm this fact.  (*Id.*)

Next, Plaintiffs claim that on an August 3, 2023, conference call with analysts and investors Defendant Colo and the company explained that the "Company's sales in brown goods were 'driven by strong demand for our new distillate and aged whiskey.'" (*Id.* at 60.)  Defendant Colo elaborated that "demand for [MGPI's] products in each of our three segments remains strong." (*Id.*) (modification in original).  Additionally, Colo said "[o]ur significant market advantages continue to position us well to support continued growth in the American whiskey category." (*Id.*) (modification in original).  Colo explained that "the majority of our expected Distilling Solutions segment brown goods sales for next year are already committed." (*Id.*)  Plaintiffs claim these statements were materially false and misleading and Defendants made them knowingly so.  (*Id.*)  Plaintiffs also claim that Defendants omitted material facts that were crucial for context.  (*Id.* at 61.)

As for the third bucket, on November 2, 2023, MGPI reported financial results for the third quarter of 2023.  (*Id.* at 62.)  In these results and the accompanying press release Defendant Colo and MGPI repeated many of the same statements from the previous disclosures.  (*Id.*)  During the earnings call, Defendant Gall noted that "demand for our brown goods from a volume standpoint remains intact." (*Id.*)  Defendants explained that their "visibility [was] improving" because MGPI had "the vast majority of our expected Distilling Solutions segment brown good sales for 2024

11

[was] already committed." (*Id.*)  MGPI again made clear that they were uniquely insulated from broader industry issues. (*Id.* at 63.)  Analysts questioned whether MGPI were "inventory building" and Defendant Colo responded "on our inventories . . . [MGPI is] not seeing anything today that would tell us that we, as a company, are imbalanced in that particular regard." (*Id.*) (modification and omission in original).   These statements were allegedly knowingly materially false, misleading, and omitted material facts. (*Id.* at 63-65.)

By February 2024, Defendant Bratcher had replaced Defendant Colo as CEO. Nonetheless, according to Plaintiffs, Defendants continued to misrepresent the state of their business. (*Id.* at 65.)  During a February 22, 2024, conference call, Defendant Bratcher noted MGPI had "healthy demand for our products" and the company "continued to experience healthy demand for new distillate and aged whiskey." (*Id.* at 66.)  Bratcher again confirmed that "more than 90% of our new distillate whiskey sales volume is committed in 2024." (*Id.*)  Defendants Bratcher and Gall again represented that MGPI was "uniquely positioned" vis-à-vis the broader industry. (*Id.*)  Gall projected brown good sales to "grow in line with or better than the broader category of American Whiskey in 2024." (*Id.*)  Plaintiffs' allegations regarding these statements are the same as in the preceding paragraphs. (*Id.* at 66-67.)  Plaintiffs also criticize the company's SEC 10-K filing because it listed possible risks to the company's business in the hypothetical, rather than acknowledging that these risks had already "materialized." (*Id.* at 67-68.)

On May 2, 2024, Defendants held another earnings call. (*Id.* at 68.)  On that call the company reiterated its shielding from market movements and insisted that demand remained strong. (*Id.*)  Analysts pressed Defendants on MGPI's inventory levels. (*Id.* at 69.)  Defendant Bratcher explained: "business [was] stabilized]" and "[w]e've worked really hard with our distributors and understanding the inventory levels and managing those levels within to meet

12

customer demand. So destocking for us at a distributor level is not a core [issue]." (*Id.*) (modifications in original). MGPI had managed to "get [] inventory manage[d] to the right level." (*Id.*) (modifications in original). Plaintiffs repeat their allegations and use former employees and internal documents as support. (*Id.* at 70-71.)

Finally on August 1, 2024, Defendants held another call to discuss second quarter 2024 earnings results. (*Id.* at 71.) Defendant Bratcher said "our inventory is exactly where we need— it has been exactly where we needed it. And we continue to monitor it on a daily basis." (*Id.*) Defendants also again touted "good visibility" and MGPI's pivot from aged to new distillate. (*Id.* at 72.) Because, according to Plaintiffs, MGPI's inventory and demand problems were already readily apparent, they complain again that these statements are false and misleading. (*Id.*)

Plaintiffs' complaint then goes on to rehash various facts that indicate the "scienter" relevant to their case. (*Id.* at 73.) First, Plaintiffs repeat the claims of the alleged former employees that the individual Defendants knew "that demand for MGPI's products had plummeted, the Company's inventory had ballooned, and MGPI's customers were not honoring their contracts." (*Id.* at 73-74.) Former employees claim that information regarding these facts was regularly before Defendants. (*Id.* at 74.) Additionally, internal documents purportedly establish that Defendants knew their public statements did not match internal reality. (*Id.* at 76-77.) Defendants' public statements indicated that they were "personally monitoring demand and inventory levels" even on a "daily basis." (*Id.* at 77.) This allegedly bolsters Plaintiffs' claims that Defendants were aware of, and consciously disregarded, material information in their statements to investors. (*Id.*) Finally, Plaintiffs allege that analyst reactions to Defendants' statements, Defendants' statements themselves, and the departure of various executives from MGPI support scienter. (*Id.* at 78-80.)

13

Plaintiffs assert that Defendants had motive and opportunity to mislead markets. (*Id.* at 81.) The individual Defendants had executive compensation packages comprised of a base salary and short- and long-term incentive payouts. (*Id.*) Long-term incentive payouts were paid in "Restricted Stock Units." (*Id.*) Plaintiffs claim that the incentives made up the "vast majority" of the individual Defendants' annual compensation. (*Id.*) Plaintiffs conclude from this that Defendants were "motivated to tout the Company's sales and demand for its products to ensure that they would get the maximum payout under the Company's compensation plans." (*Id.*) Additionally, Plaintiffs claim that the individual Defendants did not own a "significant" number of MGPI shares therefore "compensation was especially critical." (*Id.*)

Each of the individual Defendants was paid nearly half-a-million dollars or more as an annual base salary. (*Id.*) Short-term incentives are cash awards that are a percentage of the employee's base salary. (*Id.* at 81-82.) Short-term performance goals "are largely discretionary" and can include several levels of possible targets with an accompanying ladder of cash rewards. (*Id.* at 82.) In 2023, MGPI's human resources committee chose short-term incentive goals premised upon "adjusted operating income", "adjusted earnings before interest, taxes, and depreciation", and "adjusted basic earnings per share." (*Id.*) These metrics were weighted differently, and if the performance targets were met it would result in a 60-100% of salary cash payout for each individual Defendant. (*Id.*) In 2023, the company exceeded the maximum performance goal for all these targets. (*Id.*) The company maintained the same metrics in 2024 but increased the targets. (*Id.*) No short-term incentive payments were made in 2024, however, because of the company's ultimately poor financial performance. (*Id.*)

Long-term incentives were similarly determined by reference to company financial metrics. (*Id.* at 83.) Like short-term incentives, long-term incentives were valued as a percentage

14

of base salary but were paid in the form of "Restricted Stock Units." (*Id.*)  In 2023, each of the individual Defendants received nearly $1 million or more in stock units. (*Id.*)  In 2024, the metrics and targets remained mostly the same. (*Id.*)  But, because of the company's performance, no long-term awards were made. (*Id.*)  Plaintiffs theorize that because of these compensation packages Defendants "were heavily incentivized to conceal any negative information that would adversely affect revenue, price, or costs or to take any steps that would prevent them from achieving those targets." (*Id.* at 84.)  "The effect of eventually being forced to disclose the inventory and demand issues that had been plaguing the Company throughout 2023 is apparent from the dramatic reduction in compensation from fiscal 2023 to fiscal 2024." (*Id.*)

Next, Plaintiffs explain their losses that are allegedly attributable to Defendants' conduct. (*Id.* at 85.)  MGPI's securities are, and at all relevant times were, publicly traded on the NASDAQ stock exchange. (*Id.*)  Plaintiffs claim that throughout the relevant period, the share price of MGPI's securities was "artificially inflated" due to Defendants' conduct. (*Id.*)  When Defendants could no longer conceal their fraud, the value of MGPI's securities plummeted. (*Id.*)  This caused holders of MGPI's securities to suffer economic loss. (*Id.*)  During the relevant period, MGPI's share price declined by 63%, reducing the company's market capitalization by $1.7 billion. (*Id.*)  Plaintiffs plead that there is a presumption of reliance by the market on the company's disclosures and public statements regarding its financial position. (*Id.* at 87-88.)

Plaintiffs therefore bring this lawsuit as a class action, seeking recovery for themselves and all others similarly situated, who purchased MGPI securities between May 4, 2023, and October 30, 2024, and were injured by MGPI's conduct. (*Id.* at 89.)  For their injuries they plead two counts.  First, they allege Defendants violated Section 10(b) of the Securities Exchange Act and the SEC's Rule 10b-5 promulgated thereunder. (*Id.* at 91-95.)  Second, they allege that the

individual Defendants violated Section 20(a) of the Securities Exchange Act.  (*Id.* at 95-96.)

Plaintiffs ask this court to certify a class action under the Federal Rules of Civil Procedure, award

damages, attorney's fees, and any other relief the court deems proper.  (*Id.* at 96.)  Defendants

have moved to dismiss the complaint for failure to state a claim.  (Doc. 76 at 16.)  The court now

addresses that motion.

## II.    Standard

To withstand a motion to dismiss for failure to state a claim under Rule 12(b)(6), a

complaint must contain enough allegations of fact to state a claim to relief that is plausible on its

face.  *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008) (citing *Bell Atl. Corp. v.*

*Twombly*, 550 U.S. 544 (2007)).  All well-pleaded facts and the reasonable inferences derived from

those facts are viewed in the light most favorable to Plaintiffs.  *Archuleta v. Wagner*, 523 F.3d

1278, 1283 (10th Cir. 2008).  Conclusory allegations, however, have no bearing upon the court's

consideration.  *Shero v. City of Grove, Okla.*, 510 F.3d 1196, 1200 (10th Cir. 2007).

## III.    Analysis

Defendants have moved to dismiss this lawsuit for failure to state a claim.  (Doc. 76 at 16.)

In support of this contention, they first argue that Plaintiffs have failed to satisfy the particularity

requirements of Rule 9(b) and the Private Securities Litigation Reform Act ("PSLRA"), which

place limits on complaints alleging fraud.  (*Id.* at 16-29.)  Second, they argue that Plaintiffs have

failed to properly plead scienter.  (*Id.* at 29-34.)  Third, Defendants argue the complaint should be

dismissed because Plaintiffs allege Defendants collectively made certain statements, but for a

defendant to be liable for a statement, it must be attributable to that defendant.  (*Id.* at 34-35.)

Finally, Defendants argue that Plaintiffs have not properly pled the Section 20(a) claim against the

individual Defendants.  (*Id.* at 35.) Plaintiffs resist each of Defendants' arguments and request

16

leave to amend if the court dismisses the complaint. (Doc. 82.) Defendants, in support of their motion, extensively reference exhibits that, while not attached to the complaint, are either referred to in the complaint or in the public record; they move for judicial notice of these exhibits. (Doc. 77.) Plaintiffs did not file any opposition to Defendants' motion for judicial notice. Before considering the parties' arguments on the motion to dismiss, the court evaluates Defendants' motion for judicial notice.

## A. Judicial Notice

While somewhat infrequent, federal courts sometimes evaluate a motion to dismiss by considering not just the complaint, but also other documents. *Tal v. Hogan*, 453 F.3d 1244, 1264, n. 24 (10th Cir. 2006). "[F]acts subject to judicial notice may be considered in a Rule 12(b)(6) motion without converting the motion to dismiss into a motion for summary judgment." *Id.* "This allows the court to 'take judicial notice of . . . facts which are a matter of public record.'" *Id.* (citing *Van Woudenberg ex rel. Foor v. Gibson*, 211 F.3d 560, 568 (10th Cir. 2000), *abrogated on other grounds by McGregor v. Gibson*, 248 F.3d 946, 955 (10th Cir. 2001)). Judicial notice, however, does not permit the acceptance of the contents of the exhibits for their truth, but only allows their consideration to show their contents. *Id.* (citing *Oxford Asset Mgmt., Ltd. v. Jaharis*, 297 F.3d 1182, 1188 (11th Cir. 2002)). Courts may also consider "document[s] central to the plaintiff's claim and referred to in the complaint . . . at least where the document's authenticity is not in dispute." *Utah Gospel Mission v. Salt Lake City Corp.*, 425 F.3d 1249, 1253-54 (10th Cir. 2005).

The documents for which Defendants seek the court's notice are first SEC filings, earnings call transcripts, and a company document that are incorporated into Plaintiffs' complaint by reference. (Doc. 78 at 2-3.) Second, other SEC filings that are not referenced in the complaint but

are matters of public record and are not subject to disputes about authenticity. Accordingly, the court grants Defendants' motion for judicial notice. (Doc. 77.) The court now moves to evaluate the parties' submissions on Defendants' motion to dismiss.

### B. Elements of Securities Fraud

To properly allege a securities fraud claim under Section 10(b) and Rule 10b-5 (hereinafter taken together as "Section 10(b)"), Plaintiffs must plead: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 810 (2011) (internal citation and quotation marks omitted). Pleadings alleging securities fraud are subject to heightened pleading standards under Rule 9(b) and the PSLRA. *City of Philadelphia v. Fleming Companies, Inc.*, 264 F.3d 1245, 1255, n. 13 (citing Fed. R. Civ. P. 9(b); 15 U.S.C. § 78u-4(b)(2)). The PSLRA raised the pleading standard even beyond that of Rule 9(b) for two of the elements of securities fraud claims. *Adams v. Kinder-Morgan*, 340 F.3d 1083, 1095-96 (10th Cir. 2003).

The first element altered by the PSLRA is the requirement that Plaintiffs plead "a material misrepresentation or omission by the defendant." *Erica P. John Fund*, 563 U.S. at 810. There the PSLRA requires that "the complaint [] specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." *Kinder-Morgan*, 340 F.3d at 1095 (quoting 15 U.S.C. § 78u-4(b)(1) (internal quotation marks omitted)).

The second element covered by the PSLRA is scienter. *Id.* There, the Act requires that:

> [i]n any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

*Id.* at 1096 (quoting 15 U.S.C. § 78u-4(b)(2) (internal quotation marks omitted)). Therefore, as the above illustrates, Plaintiffs must satisfy a considerably strict pleading standard to survive a motion to dismiss. As the court finds Plaintiffs have failed to properly plead scienter, the court begins (and ends) its analysis there.

## C. Scienter

As explained above, to properly plead scienter, Plaintiffs must "with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that" Defendants "acted with the requisite state of mind." *Kinder-Morgan*, 340 F.3d at 1096 (quoting 15 U.S.C. § 78u-4(b)(2) (internal quotation marks omitted)). "Scienter consists of a 'mental state embracing intent to deceive, manipulate, or defraud, or recklessness.'" *Anderson v. Spirit Aerosystems Holdings, Inc.*, 827 F.3d 1229, 1236-37 (10th Cir. 2016) (quoting *Kinder-Morgan*, 340 F.3d at 1105). Reckless conduct requires that Defendants:

(1) acted in an extreme departure from the standards of ordinary care; and
(2) presented a danger of misleading buyers or sellers that was
- known to the defendants or
- so obvious that the defendants must have been aware of the danger.

*Id.* at 1237. (citing *In re Level 3 Commc'ns, Inc. Sec. Litig.*, 667 F.3d 1331, 1343, n. 12 (10th Cir. 2012)) (internal quotation marks omitted). To determine whether Plaintiffs have adequately pled scienter, the court looks at the allegations "holistically" and thus takes the facts pled together. *Id.* The Supreme Court directs the court to weigh the "inferences" drawn from these facts by Plaintiffs with "competing inferences rationally drawn." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551

19

U.S. 308, 314 (2007).  Inferences of scienter must be "cogent and compelling."  *Spirit Aerosystems Holdings*, 827 F.3d at 1237 (quoting *Tellabs*, 551 U.S. at 324).  A complaint can only survive a motion to dismiss "if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  *Tellabs*, 551 U.S. at 324.  While Plaintiffs do not need to show a "particular motive" to maintain scienter, "the absence of a motive allegation … is relevant."  *Anderson*, 827 F.3d at 1238 (quoting *In re Level 3 Commc'ns*, 667 F.3d at 1347) (internal quotation marks omitted).

With this standard in mind, the court begins by outlining broad buckets that comprise Plaintiffs' scienter allegations.  First, Plaintiffs allege that the testimony of former employees confirms that Defendants were aware of the company's struggles but failed to notify the public. (Doc. 61 at 73-76.)  Second, they claim that internal documents establish Defendants' scienter because the documents establish that Defendants knew their public statements were false.  (*Id.* at 76-77.)  Third, Defendants' own statements purportedly establish scienter.  (*Id.* at 77, 78-80.) Fourth, the reactions of market analysts evidence scienter.  (*Id.* at 78.)  Plaintiffs claim that the departures of various executives also show scienter.  (*Id.* at 80.)  Additionally, Plaintiffs point to the fact that the alleged fraud occurred within the "Company's Core Business" and to the individual Defendants' compensation plans as evidence of motive.  (*Id.* at 80-84.)  After review, for the reasons explained below, the court finds that Plaintiffs have failed to adequately plead scienter.

As explained above, Plaintiffs' theorized inference of scienter must be "cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  *Tellabs*, 551 U.S. at 324.  Plaintiffs fail to meet that burden in this case.  Plaintiffs, despite the length of their complaint, have one core allegation that runs through their lawsuit: that Defendants knowingly or

20

recklessly continued "filling" barrels of liquor despite declining demand and neglected to tell investors, thereby inflating MGPI's share price and enriching the individual Defendants because of their compensation plans. The trouble with this theory is that while it sounds plausible, on Plaintiffs' own facts, it makes little sense.

### 1. Motive

The court begins with motive, because even though it is not dispositive of the scienter element, it is relevant, and the theme of personal enrichment by the individual Defendants echoes through Plaintiffs' entire complaint. *Anderson*, 827 F.3d at 1238. Plaintiffs allege that the individual Defendants' compensation packages incentivized them to inflate the share price to meet performance goals. (Doc. 61 at 81-84.) But as Plaintiffs show in their pleaded facts, Defendants' compensation was completely untethered from share price. (*Id.* at 82-83.) Rather, Defendants' compensation was tied to three baseline financial metrics, and therefore they were incentivized to treat those metrics, and the company's underlying financial health informing those metrics, with care. The relevant metrics were "adjusted operating income" ("AOI"), "adjusted earnings before interest, taxes, and depreciation" ("EBITDA"), and "earnings per share" ("EPS"). (*Id.*) Adjusted operating income is an indicator of profit, as it measures a company's revenue after subtracting operating expenses. *See Bucks Cnty, Employee Retirement Sys v. Norfolk Southern Corp.*, 775 F. Supp. 3d 1275, 1295 (N.D. Ga. 2025). EBITDA is similar, except it excludes interest, taxes, and the depreciation and amortization of assets held by the business. EARNINGS, Black's Law Dictionary (12th ed. 2024) ("A company's income without deductions for interest expenses, taxes, depreciation expenses, or amortization expenses, used as an indicator of a company's profitability and ability to service its debt."). Earnings per share are measured by simply dividing a company's profit by the number of outstanding shares. *Id.* at EARNINGS PER SHARE ("A measure of

21

corporate value by which the corporation's net income is divided by the number of outstanding shares of common stock.").

As is obvious, these metrics are informed by the underlying financial performance of the business, not share price. In fact, the reporting of these metrics commonly affects share price. Therefore, if Defendants wanted to drive up their compensation, they were incentivized to improve those metrics as much as possible. This stands in sharp contrast to Plaintiffs' allegations tacitly accusing Defendants of fraudulently increasing the share price to increase their own compensation. (Doc. 61 at 81.) Considering the above, Plaintiffs' position is difficult to sustain.

Since Defendants were paid long-term incentives in "restricted stock units" Plaintiffs could theoretically argue that Defendants sought to drive the share price up to increase the value of the shares they would be conveyed, should the company award them long-term incentives. (*Id.*) But Plaintiffs do not explicitly make this argument, and likely for good reason. For the argument to have any teeth it would need to include an allegation that Defendants somehow realized their ill-gotten gains by selling shares after fraudulently driving up the share price but before the price came crashing down. There is no such allegation here. That means the individual Defendants' ownership of MGPI's stock put them in the same boat as Plaintiffs, worse off because of MGPI's poor financial condition. Why Defendants would draw up a scheme that predictably ends with cratering value of their own shares is unclear. *Cf. In re MGP Ingredients, Inc. Securities Litig.*, No. 20-2090-DDC, 2021 WL 3885655, at *16 (D. Kan. Aug. 31, 2021) ("As *Nguyen* observed, this theory 'might have more legs' if plaintiff alleged that defendants took ancillary actions at the same time (or similar times) which further evidenced fraud. *Nguyen*, 962 F.3d at 415 ('If defendants had sought to profit from this scheme in the interim, such as by selling off their stock or selling the company at a premium, the theory might have more legs.' (citation omitted))").

Worse still, Plaintiffs' allegations that individual Defendants pushed MGPI to fill barrels of distillate beyond its demand, (*id.* at 27), are made weaker considering the individual Defendants are incentivized to maximize "operating income", "EBITDA", and "earnings per share." (*Id.* at 82.) Every single one of these metrics would be harmed by Defendants directing MGPI to fill barrels of distillate beyond the company's demand for no reason. Such conduct would increase the company's expenses, thereby reducing its operating income, reducing its earnings before interest, taxes, depreciation, and amortization, and reducing its earnings per share, and in turn reducing Defendants' bonuses. There is no credible inference whatsoever, that these individual Defendants would have had a motive to engage in the conduct Plaintiffs claim because of their compensation packages. The far more compelling inference is exactly what Defendants posit in their motion: MGPI's customers largely determined how much the company would barrel, because they placed fill orders. (Doc. 76 at 29-30.) Indeed, Plaintiffs' complaint itself recognizes that MGPI engaged in this kind of business, and generated revenue from it! (Doc. 61 at 17, 27.) The company *made money* when customers placed fill orders *and* when MGPI stored their preordered barrels. (*Id.* at 27.) Therefore, the court finds that Plaintiffs have failed to plead a motive and now moves to other evidence of scienter submitted by Plaintiffs, beginning with the statements of former employees.

### 2. *Former Employees*

Plaintiffs submitted the statements of four former employees as part of their complaint. (*Id.* at 24-39.) Defendants resist the use of allegations based on the former employees to plead scienter. (Doc. 76 at 29-31.) At their core, the statements of former employees are offered by Plaintiffs to show Defendants' knowledge and awareness of material facts that they omitted from their public statements to investors. (*Id.* at 29.) Plaintiffs cite case law for the proposition that a

difference between internal reporting and public statements supports an inference of scienter. (Doc. 82 at 30.) (citing *IBT Employer Group Welfare Fund v. Compass Minerals Int'l*, 706 F. Supp. 3d 1225, 1259 (D. Kan. 2023)).  While the Tenth Circuit supports this view, it cautions that courts "must consider plausible competing inferences as well." *In re Level 3 Commc'ns*, 667 F.3d at 1345.

FE-1 was a Warehouse Logistics and Quality Manager for MGPI between January 2023 and July 2024.  (Doc. 61 at 25-26.)  He voluntarily left the company.  (*Id.* at 26.)  His responsibilities involved managing inventory and logistics at the company's "two primary storage locations in Williamstown, Kentucky and Lawrenceburg, Indiana." (*Id.*)  FE-1 reported to the "executive leadership team" and explains he was on a weekly Wednesday call with "senior executives, including Defendants Bratcher and Gall; VP of Manufacturing Chris Wieczorek; VP and Chief Commercial Officer Amel Pasagic; and Director of Distillery Operations Mike Templin." (*Id.*)  These meetings became more frequent, daily, as the company "got closer to month-end and quarter-end reporting periods." (*Id.*)

On these calls, the participants discussed:

detailed reports showing MGPI's demand and inventory positions going back to 2022, including the Company's 'fill' numbers—*i.e.*, how many barrels MGPI was filling with spirits month-over-month and year-over-year—and the Company's 'pick' numbers—*i.e.*, how many barrels were being physically picked from MGPI storage facilities and transported to the customer whether by truck or rail, which was an indicator of customer demand for MGPI.

(*Id.*)  Inventory and sales were managed "daily" with daily key performance metrics on warehousing provided to executive leadership.  (*Id.*)  FE-1 reports that "picks" slowed in early 2023 and "that internal reports that he maintained on a daily basis showed that MGPI's 'fill' rate started significantly outpacing its 'pick' rate beginning in March 2023." (*Id.* at 27.)  This was apparently a "major red flag" within the Company.  (*Id.*)  FE-1 goes on to repeat Plaintiffs'

allegations that MGPI continued filling barrels of spirits "for which there was no customer demand." (*Id.*) FE-1 also noted that large customers of MGPI's were reducing "picks" and MGPI allowed some customers to adjust, get out of, or take a discount or incentive on their contractual commitments. (*Id.* at 28.) FE-1 says he brought his concerns to the individual Defendants, who apparently said they would not stop filling barrels, and that as a Warehousing Logistics and Quality Manager, it was FE-1's job to "figure out where to put those barrels" despite the space constraints. (*Id.* at 28.) According to FE-1, as a consequence, the average age of MGPI's barrels in storage went from 3-4 years to 5-7 years. (*Id.* at 29.) MGPI began looking for new storage facilities, and had one planned in Williamstown, Kentucky, but the plans fell through, and the storage issue was exacerbated. (*Id.* at 31-32.) MGPI then began sending barrels to third-party storage facilities. (*Id.* at 32.) During FE-1's tenure, barrels in inventory increased from 1.2 million to 3.6 million. (*Id.* at 32.) FE-1 stated that Defendants statements in "February and May 2024 that inventory was 'stabilized' and MGPI remained uniquely positioned to grow as a company in this dynamic operating environment" were saying something publicly that was not true internally. (*Id.* at 33.) FE-1 alleged that Defendants were personally profiting from continuing to produce distillate via their bonuses, which as the court explained above, is unpersuasive given the allegations within Plaintiff's broader complaint. (*Id.*) Finally, FE-1 explains that Defendants "knew every step of the way" and that "the documents are pretty damning and show that they continued to fill when sales declined." (*Id.* at 34.)

Despite FE-1's allegations, the court is unpersuaded by Plaintiffs' suggested inference, which hews tightly to their allegations on motive. Plaintiffs are suggesting that for no articulable reason other than "rich bonuses" (*id.* at 33), already addressed above, Defendants continued filling barrels and thus incurring expenses despite no demand. That simply defies rationality. Again, the

25

much more plausible inference is that of Defendants: "MGPI was filling like gangbusters . . . because its customers placed more and more fill orders." (Doc. 76 at 29-30.) As to FE-1's limited claims about Defendant Bratcher and Gall's comments to investors in February and May 2024 not reflecting internal reality, the court finds that the two statements identified by Plaintiffs are largely irrelevant to their allegations. The first statement, that inventory had "stabilized" was not related to MGPI's Distilling Solutions segment but instead related to Branded Spirits' "distributor inventory levels." (Doc. 75-8 at 11.) Second, the statement that MGPI was "uniquely positioned to grow as a company in this dynamic operating environment" is puffery, the kind of mundane corporate optimism that permeates virtually every earnings call Wall Street tunes in to. As courts have recognized, this kind of statement is not actionable. *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1119 (10th Cir. 1997) ("Statements classified as 'corporate optimism' or 'mere puffing' are typically forward-looking statements, or are generalized statements of optimism that are not capable of objective verification. Vague, optimistic statements are not actionable because reasonable investors do not rely on them in making investment decisions.").

FE-2's comments are even less supportive. FE-2 was MGPI's "Executive Vice President of Operations" from June 2024 to October 2024. (Doc. 61 at 34.) His duties included "building a professional supply chain and all operational safety related to engineering, manufacturing, and supply chain logistics." (*Id.*) FE-2 reported directly to the CEO, Defendant Bratcher. (*Id.*) He explained that "[c]ustomers were heavy on inventory and all of the suppliers, including MGPI were heavy on inventory." (*Id.*) FE-2 also stated that it was "quite shocking" that contracts between MGPI and its customers were not being honored because of low demand. (*Id.* at 35.) FE-2 speculated that MGPI should have begun reducing inventory up to two years prior. (*Id.*) He reports that he told leadership about this issue. (*Id.*) "Everything" FE-2 "heard in the office was

26

that inventory was bloated . . . and that all the other big players were in a similar situation." (*Id.*) FE-2 repeated FE-1's contention that MGPI was not "slowing down production." (*Id.*) FE-2 goes on to disparage Defendant Bratcher as a "guy with an 'ego the size of Kansas.'" (*Id.* at 36.) FE-2 also denigrated MGPI's customer contracts calling them "garbage" and stating that they lacked "any teeth." (*Id.*) As a consequence, customers could not be counted on to take volume. (*Id.*) FE-2 says he had regular meetings with MGPI leadership, and the inventory problems were "front and center." (*Id.* at 37.) FE-2 also claims that Defendants knew about these problems long before they disclosed them to the public. (*Id.*)

FE-2's statements do not identify any particular information that Defendants should have relayed to markets. He instead makes generalized accusations about Defendants' business decisions. *Kinder-Morgan*, 340 F.3d at 1105 (The PSLRA requires "that the complaint shall 'state with particularity facts giving rise to a strong inference that the defendant acted with ... [scienter].'") (modification in original) (quoting 15 U.S.C. § 78u-4(b)(2)). Further, the court notes that FE-2 was only at MGPI for 4 months towards the tail end of the class period. (*Id.* at 34.) This makes his general accusations even less relevant when determining an inference of scienter.

FE-3 was a Director of Sales Operations for Distilling Solutions from January 2023 to October 2023. (Doc. 61 at 37.) FE-3 stated that due to "oversaturation of the market" contract distilling prices had been "driven . . . way down." (*Id*. at 38.) FE-3 repeats other former employee allegations of MGPI allowing customers out of contractual commitments. (*Id.*) He claims he attended weekly meetings with Defendant Bratcher and other MGPI leadership where they discussed the variance between internal forecasts and actual sales. (*Id.*) These claims hardly even relate to the individual Defendants, and to the extent they do, they are general and suffer from the same flaw as FE-2's comments. *Kinder-Morgan*, 340 F.3d at 1105.

27

FE-4 was a Customer Service Specialist at MGPI from June 2022 to January 2024. (Doc. 61 at 39.)  None of his comments relate to interactions with the individual Defendants and therefore do not inform their state of mind. (*Id.*) *See Anderson*, 827 F.3d at 1244 ("As relatively low-level employees, these witnesses could not provide evidence bearing on the executives' mental states.").  The court holds that following the above analysis, the statements of the former employees do not help establish Defendants' scienter.

### 3.   *Internal Documents*

Plaintiffs have presented excerpts from various internal company documents that they somehow acquired from MGPI. (Doc. 61 at 39.)  These documents include warehouse capacity reports, historical fill and pick rate data, and a business review meeting report. (*Id.* at 40.)  These documents purportedly show "daily, weekly, and/or monthly demand and excess inventory data for 2022 and 2023, including for MGPI's 'fills' . . . and 'picks.'" (*Id.*)  According to Plaintiffs, the documents show that "by January 2023, the number of barrels that MGPI was filling per month was vastly exceeding the number of barrels that the Company's customers were picking up." (*Id.* at 40.)  For most of the year, the company was filling "more than double the number of barrels that customers [were] picking." (*Id.*)

The documents also show that MGPI was looking for storage solutions for its inventory as two presentations were created to provide leadership with "an in-depth examination of MGPI's warehouse logistics in the fall of 2023." (*Id.* at 41.)  The presentations show a decline in average picks per month from 2022 to 2023. (*Id.* at 42.)  The difference between picks and fills increased substantially in 2023, rising to a surplus of over 188,000 barrels, which according to Plaintiffs was an all-time high. (*Id.* at 43-44.)  Plaintiffs claim that these presentations support the notion that the company was running out of space and would be out of space by mid-to-late 2024. (*Id.* at 44-

45.) Plaintiffs contend that these documents conflict with Defendant Colo's public statements in a November 2023 earnings call where he said, "on our inventories . . . [MGPI is] not seeing anything today that would tell us that we, as a company, are imbalanced in that particular regard." (*Id.* at 47) (modification in original). Defendant Colo also said, "we're pretty much through any issues with excess inventory at the distributor level." (*Id.*)

The court again finds these claims to be of limited value in pleading scienter. First, Defendant Colo's statement about being "through any issues with excess inventory" is related to inventory at distributors *not* MGPI. (*Id.*) This is further clarified by reviewing the transcript of the earnings call, the key portion of which Plaintiffs omit. (Doc. 75-6 at 10-11.) And again, Defendant Colo (and the analyst that prompted the response) was referring to MGPI's Branded Spirits segment, not Distilling Solutions. (*Id.*) As noted above, Distilling Solutions is the primary business segment at issue in this lawsuit. (Doc. 61 at 80.)

Second, Defendants' statement that MGPI's inventories were not, in their eyes, "imbalanced" is unexceptional given the context. Plaintiffs posit that because MGPI's inventories were growing and that the company was having trouble finding storage, this must mean that inventory was imbalanced and Defendant Colo misled investors. (Doc. 82 at 12.) But this is not clear from the internal documents cited by Plaintiff. Some of the documents simply provide data about the increase in inventory. (Doc. 61 at 40-44.) Others express concerns about storage. (*Id.* at 44-48.) But none of the documents indicate that Defendants had an underlying concern about the financial health of the company or "balance" of the inventory that they either recklessly or intentionally concealed from the market. *Anderson*, 827 F.3d at 1236-37 ("Scienter consists of a 'mental state embracing intent to deceive, manipulate, or defraud, or recklessness.") (internal quotation marks and citation omitted). Without more, the far more compelling inference is again

supplied by Defendants: the company's plan for expansion of the warehouse fell through.  (Doc. 76 at 24-25.)  This is especially true given Defendants' clarification via one of the judicially noticed documents that "fills" have outpaced "picks" for the last decade, reaching similarly high levels between 2015 and 2017.  (Doc. 75-7 at 3.)  For these reasons the court holds that Plaintiffs' internal documents do not support an inference of scienter.

### 4.  Individual Defendants' Own Statements

Plaintiffs also use statements from the individual Defendants that they "personally monitored demand and inventory levels" to show scienter.  (Doc. 61 at 77.)  In February and May 2024, Defendant Bratcher assured investors he was monitoring the "potential impact of inventory levels at distributors, overall whiskey supply and consumption patterns, and inflation on consumers."  (*Id.*)  As the court has noted previously, while related, the inventory levels at distributors are largely not what the rest of the complaint focuses on.

Defendant Bratcher also told investors that "for our company [] our inventory is exactly where we needed it."  (*Id.*)  Again, viewing the statement in its full context, while somewhat unclear, it appears that Defendant Bratcher was referring to the "Branded Spirits" segment of MGPI, not "Distilling Solutions." (Doc. 75-2 at 8.)  Additionally, Plaintiffs argue that Defendants Bratcher and Gall assured markets that Defendants were monitoring inventory, demand, price points, and different scenarios.  (*Id.*)  But Plaintiffs have not offered anything to show that this is untrue, or that Defendants were knowingly or recklessly concealing information they knew from markets and therefore these facts do not help plead scienter.

### 5.  Analyst Reactions

Plaintiffs also cite various surprised reactions from analysts when Defendants disclosed poor financial results in October 2024 as evidence of scienter.  (Doc. 61 at 78.)  The analysts

highlighted "credibility issues" with the company and the "material surprise" of the disclosure. (*Id.*) They also noted that American Whiskey consumption has slowed for the last twelve to eighteen months and yet Defendants were "just realizing it, seeing it now." (*Id.*) Defendants argue that this is "pleading by hindsight" and thus cannot be evidence of scienter. (Doc. 76 at 33.) While the court declines to say as a normative matter that analyst reactions can never be relevant to a scienter inquiry, multiple cases from the Tenth Circuit have expressed skepticism about evidence after the class period serving as evidence of scienter. *Anderson*, 827 F.3d at 1247 ("The plaintiffs argue that in light of the magnitude of the loss that Spirit ultimately sustained, Spirit must have had scienter when each of these occurrences took place. These arguments amount to allegations of "fraud by hindsight," which does not constitute securities fraud."); *In re Level 3 Commc'ns*, 667 F.3d at 1347 ("While this disclosure addresses the issues Level 3 experienced during the class period, it does not constitute an admission that defendants spoke fraudulently during that time. Rather, it reflects defendants' hindsight review of the integration process. This contributes nothing to an inference of scienter."); *City of Philadelphia v. Fleming*, 264 F.3d 1245, 1260 (10th Cir. 2001) ("Plaintiffs should not be allowed to proceed with allegations of 'fraud by hindsight,' for example, because corporate officials should be liable for failing to reveal only 'those material facts reasonably available to them.' 'Thus, allegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did do not suffice to make out a claim of securities fraud.'") (internal citations omitted). Therefore, the court will not consider the reactions of analysts to Defendants' later disclosure as evidence of scienter.

### 6. *Executive Departures*

Next to last, Plaintiffs argue that Defendant Colo's departure as CEO at the end of 2023 and Defendant Bratcher's departure as CEO at the end of 2024 evidence scienter. (Doc. 61 at 80.)

Plaintiffs believe that the timing of Defendants' departures is "sudden and suspicious" especially in the case of Defendant Bratcher who left only two months after "Defendants' fraud was fully revealed." (*Id.*) Moreover, they claim that Defendants' failure to appoint a successor to Defendant Bratcher also indicates scienter. (Doc. 82 at 33-34.) But Plaintiffs' allegations here are completely theoretical. Nothing about what is pled indicates Defendants' departures were suspicious except Plaintiffs' hunch. Accordingly, it cannot be evidence of scienter. *See In re Hertz Global Holdings, Inc.*, 905 F.3d 106, 119 (3d Cir. 2018) ("But pleading scienter requires more than pleading a link between bad news and an executive's resignation. Changes in leadership are only to be expected when leadership fails. That is not, in itself, a symbol of fraud. Corporate resignations do not strengthen an inference of scienter, when, as here, the allegations do not cogently suggest that the resignations resulted from the relevant executives' knowing or reckless involvement in a fraud.").

### 7. *Core Business*

Finally, Plaintiffs allege that because the purported fraud occurred in Defendants' largest business segment, Distilling Solutions, they must have been aware of any issues within it that "materially impacted" MGPI. (Doc. 61 at 80.) Distilling Solutions accounted for 54% of MGPI's revenue in 2022 and 2023. (*Id.*) While the theory that Plaintiffs posit may be true, top executives are likely to know what is going on in their largest business segment, it is insufficient by itself to infer scienter. *Meitav Dash Provident Funds and Pension Ltd. v. Spirit AeroSystems Holdings*, 79 F.4th 1209, 1222 (10th Cir. 2023) ("But to show scienter, the plaintiffs can't rely solely on Mr. Gentile's active involvement in a 'particular project' even when the project involves 'Spirit's core operations.'") (quoting *Anderson*, 827 F.3d at 1245-46).

On the whole, and taken together, the court does not view Plaintiffs' pleaded facts and theorized inferences evidencing scienter as satisfying the *Tellabs* requirement that they be "cogent

and at least as compelling as any opposing inference of nonfraudulent intent." 551 U.S. at 314. Simply put, the nonfraudulent inferences proposed by Defendants are more compelling. Given the corporate structure, business practices, compensation schemes of MGPI, and the actions of the individual Defendants, it is far more likely that Defendants poorly handled quickly changing circumstances and market conditions affecting their business. This alone does not merit a finding of scienter to defraud. Without scienter by the individual Defendants, Plaintiffs cannot plead a violation of the securities laws alleged in count I and count II of the complaint by either the company or the individual Defendants. (Doc. 61 at 91-96.) Therefore, Defendants' motion to dismiss must be granted.

### D.    Leave to Amend

Plaintiffs requested leave to amend their complaint if the court granted Defendants' motion to dismiss. (Doc. 82 at 35.) That request is denied. First, Plaintiffs' complaint is already 99 pages. Second, Plaintiffs' request does not comply with this court's local rules which require a copy of the proposed amendment be attached to a motion for leave to amend. D. Kan. Local R. 15.1 (a)(2). Third, the court finds it highly likely that any amendment would be futile, given the serious flaws in Plaintiffs' theory of the case as highlighted in the above discussion. *Wilkerson v. Shinseki*, 606 F.3d 1256, 1267 (10th Cir. 2010) ("A district court should refuse leave to amend 'only [upon] a showing of undue delay, undue prejudice to the opposing party, bad faith or dilatory motive, failure to cure deficiencies by amendments previously allowed, or futility of amendment.'") (quoting *Duncan v. Manager, Dep't of Safety, City & Cnty. of Denver,* 397 F.3d 1300, 1315 (10th Cir. 2005)).

### IV.    Conclusion

34

For the foregoing reasons, Defendants' motion to dismiss (Doc. 74), is GRANTED.  As a part of its order, the court also GRANTS Defendants' motion for judicial notice.  (Doc. 77.)

IT IS SO ORDERED.  Dated this 25th day of March 2025.


s/ John Broomes
JOHN W. BROOMES
CHIEF UNITED STATES DISTRICT JUDGE